NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL MIRABELLA, : | |
| : | **Civil Action No. 12-6218 (SRC)** |
| Plaintiff, : | |
| : | **OPINION** |
| v. : | |
| : | |
| OASIS FOODS COMPANY and : | |
| ANTHONY ALVES, : | |
| : | |
| Defendants. : | |

**CHESLER**, District Judge

This matter comes before the Court upon the motion for summary judgment filed by Defendant Oasis Foods Company ("Defendant" or "the Company"). Plaintiff Michael Mirabella ("Plaintiff") opposes the motion. The Court has considered the papers filed by the parties and proceeds to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons that follow, the Court will grant Defendant's motion for summary judgment.

**I.   BACKGROUND**

   **A.  Plaintiff's Hiring, and Conflicts with Management**

This matter involves an individual's allegation that his former employer fired him due to his age and physical disability. Defendant is a company that manufactures soy products. It hired Plaintiff in February of 2011, when Plaintiff was forty-nine years old. Plaintiff worked for the Company as a Regional Sales Manager out of his home office in Rochester, New York.

A few months after his hiring, Plaintiff attended a meeting with Anthony Alves, the Company's President and CEO, and Mike Metrokotsas, who goes by "Metro" at work, and who would soon become Plaintiff's direct supervisor. At the meeting, Plaintiff brought up the fact

1

that the Company had recently fired someone who had been instrumental in hiring Plaintiff, and Plaintiff was therefore worried about his job. Alves told Plaintiff not to worry about his position.

Soon after that, problems began to develop in the working relationship between Plaintiff and his supervisor. Metro often became frustrated with Plaintiff for failing to follow instructions and for dismissing his requests. For his part, Plaintiff viewed Metro as a micromanager whose expectations about sales growth were unrealistic.

Numerous emails illustrate the dynamic between Plaintiff and his boss. In late November of 2011, Plaintiff forwarded Metro an email from a customer, yet Plaintiff did not offer any independent commentary or suggestions for how to respond to the customer's concern. Metro expressed frustration with that approach. In January of 2012, Plaintiff again forwarded along a customer's email without comment. Metro wrote to him that that would be the "[l]ast time I'm going to tell you about forwarding a message with no copy – and I mean it[,]" and further asking, "You really couldn't reply to this?" (Hill Cert. Ex. H). Another time, Plaintiff sent Metro an email about an outside food broker, but he copied the broker on the email. Metro responded, "We need to speak about how you do things. I know you might be frustrated by copying outside people to cover yourself – but this is not 'right practice' and it is insulting." (Hill Cert. Ex. F).

In addition to Plaintiff's electronic communications, Alves and Metro found other problems in Plaintiff's work. The two managers viewed Plaintiff's workload calendar as too sparse. Metro suggested to Plaintiff that he contact their headquarters to request additional marketing materials that he could then distribute. Plaintiff did not do so. On November 23, 2011, Metro reviewed Plaintiff's sales-call numbers and concluded that they appeared "weak." (Hill Cert. Ex. K). That same month, Metro assessed Plaintiff's relationship with a sales broker,

and he said it looked as though the broker was "handling [Plaintiff,] and not the other way around." (Hill Cert. Ex. J).

In late December of 2011, Metro recommended that the Company fire Plaintiff. One of Plaintiff's accounts had fallen behind on payments, and Plaintiff was tasked with resolving the problem. Alves wrote to Metro: "By allowing [Plaintiff] to handle this we may be putting ourselves in a more difficult position forward to work with this account[.] I believe we should pull [Plaintiff] from all [New York] accounts[.]" (Hill Cert. Ex. L). Metro responded that he not only agreed that Plaintiff "should be pulled from all NY accounts immediately[,]" he went further to recommend that Plaintiff be "terminated effective 2/1 [of 2012.]" (Hill Cert. Ex. L).

Instead of terminating Plaintiff's position at that time, in January 2012 the Company pulled Plaintiff off of all of his accounts and gave him a different position. Yet Plaintiff continued to have disputes with Metro in that position. On January 19, the two had a disagreement because Plaintiff wanted to fly rather than drive to a work event due to an MRI that he had scheduled. On January 21, Metro wrote to Plaintiff that he had called him twice the day before without any response, and he asked Plaintiff to call him back. Plaintiff emailed him back instead of calling.

### B. Medical Diagnosis, Continued Conflict, and Termination

The above history transpired before Plaintiff's diagnosis. On January 27, 2012, doctors informed Plaintiff that he had a benign brain tumor near his left ear. Plaintiff was unaware of the problem before his diagnosis, as was everyone at work. Plaintiff told Metro about the diagnosis on the same day he received it.

The Company management continued to have problems with Plaintiff's work after his diagnosis. Around that time, Metro asked Plaintiff to devise a sales plan for his new position.

Plaintiff submitted it, but Metro was dissatisfied.  On February 24, 2012, while Plaintiff was away on a one-week vacation, Metro emailed him as follows:

> I'm looking at your schedule for next week and I don't see anything I like.  In fact, I see the same crap we spoke time and time about – "Albany market" with no specific account details is completely unacceptable.  One appointment per day the week's prior to your vacation is unacceptable.  Mon & Tuesday in Albany Market followed by NO appointments the next week and a half is unacceptable.  We spoke about this specifically – to take off for a week is ok only if you come back to a complete calendar not come back and begin to put together your schedule.  We need to discuss what's going on and if you truly want to be [here.]

(Hill Cert. Ex. P).

On February 26th, Metro wrote to Alves to again recommend that Plaintiff be fired:  "I would like to terminate [Plaintiff] on Monday."  (Hill. Cert. Ex. Q).  He stated that Plaintiff's "qualifications on his resume were very misleading . . . [his] knowledge of the food service industry was superficial and had no probative value to [us]."  (Id.).  Metro went on to summarize various problems with Plaintiff's performance, including his scheduling, management, and "incoherent" communication skills, and Metro noted that Plaintiff "consistently and defiantly refused to execute company directives."  (Id.).  Alves approved Metro's recommendation.

On February 27th, Metro called Plaintiff to inform him that the Company was terminating his position.  This was almost exactly one year after the date Plaintiff was hired.  Plaintiff was now fifty years old.

**C. Procedural History**

Plaintiff filed a Complaint against Defendants in New Jersey Superior Court, alleging that Defendants violated the New Jersey Law Against Discrimination ("NJLAD"), the New York State Human Rights Law ("NYSHRL"), or the American Disabilities Act ("ADA").  Defendants removed the action to this Court on October 9, 2012.

4

On September 26th, 2014, Defendant Company moved for summary judgment on all of Plaintiff's claims. In support of its motion, Defendant argues that Plaintiff has failed to present evidence to prove that the Company discriminated against him either on the basis of his age or his health diagnosis. Plaintiff opposes the motion, arguing that the circumstances of his termination create a reasonable inference of unlawful discrimination.

**II.    DISCUSSION**

    **A. Legal Standard**

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The court may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial. On claims for which the moving party does not bear the burden of proof at trial, the movant must point out to the district court "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S.

at 325.  In contrast, "[w]hen the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

### B.  Choice of Law

The parties disagree over whether the NJLAD or the NYSHRL apply to Plaintiff's claims.  In this context, the substantive law of the state of Plaintiff's employment governs.  See Satz v. Taipina, No. Civ. 01-5921 (JBS), 2003 WL 22207205, at *16 (D.N.J. Apr. 15, 2003), aff'd, 122 F. App'x 598 (3d Cir. 2005) ("New Jersey courts have consistently applied the law of the state of employment to workplace claims, and have therefore only applied the NJLAD if the plaintiff worked in New Jersey.").  Defendant emphasizes that Plaintiff's employment was based

out of his home office in New York, while Plaintiff notes that Defendant is headquartered in New Jersey, and Plaintiff traveled there numerous times for work. The cases to which the parties cite suggest that it is where Plaintiff worked, rather than where Defendant was located or where Plaintiff occasionally traveled to for business, that is significant. See, e.g., Seibert v. Quest Diagnostics, No. Civ. 11-304 (KSH), 2012 WL 1044308, at *5 (D.N.J. Mar. 28, 2012); Albert v. DRS Technologies, No. 2:10-CV-03886 (WJM), 2011 WL 2036965, at *2 (D.N.J. May 23, 2011); Peikin v. Kimmel & Silverman, 576 F. Supp. 2d 654, 657 (D.N.J. 2008) (Simandle, C.J.); Weinberg, 2006 WL 1096908, at *6; Satz v. Taipina, No. 01-cv-5921 (JBS), 2003 WL 22207205, at *6 (D.N.J. Apr. 15, 2003), aff'd, 122 F. App'x 598 (3d Cir. 2005).

However, the Court need not resolve the parties' dispute. The first step in a choice-of-law analysis is determining whether there is a conflict between the cited laws. Lebegern v. Forman, 471 F.3d 424, 429 (3d Cir. 2006) ("Under New Jersey choice of law principles, we must first establish whether there is an actual conflict."); P.V. v. Camp Jaycee, 197 N.J. 132, 143 (2008) ("If not, there is no choice-of-law issue to be resolved."). The briefs submitted on this motion do not articulate any way in which the application of the NJLAD would differ from applying the NYSHRL. Indeed, both the NYSHRL and the NJLAD turn on the same federal framework discussed below. See, e.g., Robles v. Cox & Co., 987 F. Supp. 2d 199, 205 (E.D.N.Y. 2013) ("[A] claim brought pursuant to the . . . NYSHRL is analyzed under the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas[.]"); Baron v. Advanced Asset & Prop. Mgmt. Solutions, No. 11-CV-2155 (DRH), 2014 WL 1679049 (E.D.N.Y. Apr. 29, 2014) ("[S]ummary judgment motions under the NYSHRL are analyzed under the [] McDonnell Douglas burden-shifting framework[.]"); Wolpert v. Abbott Labs., 817 F. Supp. 2d 424, 433 (D.N.J. 2011) ("When a plaintiff seeks to prove a claim of employment

7

discrimination under the NJLAD in the absence of direct evidence of discrimination, New Jersey and Federal Courts analyze the claim under the burden-shifting framework of McDonnell Douglas[.]"); see also Arenas v. L'Oreal USA Products, 790 F. Supp. 2d 230, 235 (D.N.J. 2011) (Debevoise, J.), aff'd, 461 F. App'x 131 (3d Cir. 2012) ("[C]ircumstantial evidence of wrongful discharge under the NJLAD is demonstrated through the familiar analytical framework of McDonnell Douglas[.]").

Accordingly, the Court's analysis would follow the same contours and reach the same result under either the NJLAD or the NYSHRL. The Court therefore need not pick which of the two statutes is necessarily triggered. See Huber v. Taylor, 469 F.3d 67, 74 (3d Cir. 2006) ("If there is no conflict, then the district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."); ALA v. CCAIR, 29 F.3d 855, 858 (3d Cir. 1994) ("Although it has not been resolved . . . [which] law applies to this action, both states have adopted the same relevant language from [federal legislation], and no conflict appears in the relevant case law. Therefore, no choice of law analysis need be performed.").

### C. Burden-Shifting Framework

To assess claims of employment discrimination, the Court applies the burden-shifting framework set forth initially in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and later modified. That framework has three steps:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

> Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (internal citations and quotation marks omitted).

The Court will first apply this framework to Plaintiff's claim that Defendant Company fired him on the basis of his disability, and then to his contention that he was fired due to his age.

### D. Alleged Disability Discrimination

Plaintiff contends that Defendant Company fired him because he received a medical diagnosis that rendered him disabled. To establish a prima facie case of disability discrimination, Plaintiff must demonstrate that he was disabled, that he performed his job satisfactorily, and that the circumstances of his firing give rise to an inference of discrimination. See Stephan v. W. Irondequoit Cent. Sch. Dist., 769 F. Supp. 2d 104, 107 (W.D.N.Y.), aff'd sub nom., Stephan v. W. Irondequoit Cent. Sch. Dist., 450 F. App'x 77 (2d Cir. 2011). The initial burden of stating a prima facie case is not onerous. See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006) ("[T]here is a low bar for establishing a prima facie case of employment discrimination . . . . the prima facie case is easily made out[.]") (internal citations and quotation marks omitted). Here, (i) Defendant concedes that Plaintiff is disabled; (ii) Plaintiff urges that he performed his job satisfactorily; and (iii) Plaintiff was fired shortly after telling his boss about his diagnosis. The Court will thus assume for purposes of analysis that Plaintiff has cleared the low hurdle of stating a prima facie case.

Assuming arguendo that Plaintiff has made such a demonstration, Defendant must plead a nondiscriminatory reason for which it fired Plaintiff. Defendant has indeed put forward such a legitimate explanation: Plaintiff's performance and communication skills were poor, and he was consistently the source of frustration and dissatisfaction at work.

Defendant having provided a nondiscriminatory justification for its decision, the burden returns to Plaintiff to rebut that proposition as merely a pretext for discrimination. After a

9

careful review of the record, the Court finds not even a scintilla of evidence which would suggest that Defendant fired Plaintiff due to his disability, or that dissatisfaction with his work was pretextual.  In making that finding, the Court notes the extensive history reviewed in the Background section above, which illustrates that Plaintiff's direct supervisor was displeased with Plaintiff's work and communication long before anyone learned of Plaintiff's condition.  Before Plaintiff's diagnosis, Alves and Metro were sufficiently discouraged by Plaintiff's efforts that they removed him from all of the accounts he had been working on.  Before the diagnosis, Metro recommended that the Company fire Plaintiff in light of his problematic emails and non-adherence to instructions.  The management's desire to fire Plaintiff cannot have been caused by a diagnosis which came after that desire was articulated in writing.

      The timing of Defendant Company's dissatisfaction with Plaintiff undermines his claim that such dissatisfaction is just a pretext.  See Roggenbach v. Touro Coll. of Osteopathic Med., No. 13-civ-221 (HB), 2014 WL 1046697, at *4 (S.D.N.Y. Mar. 13, 2014) (rejecting plaintiff's claim that adverse action was taken against him based on HIV because plaintiff "failed to establish that any Defendant had any knowledge of Plaintiff's HIV status before the disciplinary process against him began, and any subsequent disciplinary action [therefore] could not have been 'due to' his disability."); see also Chiari v. New York Racing Ass'n Inc., 972 F. Supp. 2d 346, 364 (E.D.N.Y. 2013) (noting that plaintiff failed to demonstrate that employer knew of disability when it made discharge decision).  In short, Plaintiff has given the Court no reason to infer that Defendant's explanation constitutes pretext, and Plaintiff has accordingly failed to satisfy the third McDonnell Douglas step.

### E. Alleged Age Discrimination

Plaintiff next asserts that he was fired due to his age. To make a prima facie showing of age discrimination, Plaintiff must demonstrate that "he was (1) within the protected age group; (2) qualified for the position; (3) discharged; and (4) that such discharge occurred under circumstances giving rise to an inference of discrimination." Carlton v. Mystic Transp., 202 F.3d 129, 134 (2d Cir. 2000). Plaintiff was fired at age fifty; he contends that he was qualified for his position; and Plaintiff presents some evidence that Defendant Company sought to hire and train less experienced employees. The Court will accordingly assume for purposes of analysis that Plaintiff has established a prima facie case of age discrimination. Following the same McDonnell Douglas framework, the burden shifts to Defendant to articulate a nondiscriminatory purpose for firing Plaintiff. Defendant again points to Plaintiff's dismal work performance.

Once more, Plaintiff carries the burden to rebut that proffered explanation as pretext. He simply has not done so. Plaintiff relies on the fact that Defendant also fired other sales workers who ranged in age from 49 to 60 years old, while the remaining workers were allegedly younger. Yet the record shows no wide gulf in age between those terminated and those retained. One of the sales employees kept on was 48, and one let go was 33. It appears that Defendant hired sales employees ranging from their early 30s into their late 40s. Demonstrating a pattern of firing can, in some instances, bespeak age discrimination, but here Plaintiff has not demonstrated that younger employees fared significantly better than older employees at Defendant Company.

Though not necessary for the Court's holding, other factors also undermine Plaintiff's efforts to rebut Defendant's justification. See generally Grady v. Affiliated Cent., 130 F.3d 553, 560 (2d Cir.1997) (noting some facts may "strongly suggest that invidious discrimination was unlikely."). Defendant Company hired Plaintiff when he was forty-nine years old and fired him

when he was fifty.  That Plaintiff was practically the same age when he was brought on and let go intuitively undermines the idea that age was his problem.  Cf. Vinokur v. Sovereign Bank, 701 F. Supp. 2d 276, 288 (E.D.N.Y. 2010) ("[A]ny inference of age discrimination is undercut where, as here, a plaintiff is over 40 years old when she is hired.") (internal citation and quotation marks omitted).  It is also worth noting that Metro, who pushed for Plaintiff's firing, is older than Plaintiff, which further diminishes the plausibility of age discrimination.  Cf. Whitting v. Locust Valley Cent. Sch. Dist., No. 10-cv-0742 (ADS), 2012 WL 5289617, at *12 (E.D.N.Y. Oct. 22, 2012) ("[The Court finds that the administrators involved in the employment decisions at issue in the present case were all over 40 years of age . . . . [and it] is well settled that age discrimination is unlikely where the people who partake in the claimed adverse employment actions affecting a plaintiff's employment are over 40 years old.").

All told, the record demonstrates that Plaintiff's termination was the endpoint of a long history of frustration with Plaintiff's work habits.  Management was consistently fed up with Plaintiff's failure to independently respond to customers' concerns, his non-adherence to instructions, and his relaxed workload.  Plaintiff has failed to rebut this nondiscriminatory justification for the firing, and has thus failed to satisfy McDonnell Douglas.

### III.    CONCLUSION

For the reasons above, the Court finds that Defendant has demonstrated that it is entitled to summary judgment on all claims in this action.  Its motion will be granted in its entirety.  An appropriate Order will be filed.

    s/ Stanley R. Chesler
STANLEY R. CHESLER
United States District Judge

Dated: December 16, 2014